When you're ready. Yes, Your Honor. May it please the Court, my name is Nadia Farah and I represent Mr. Salar Khoshfahm. This is a case of a minor who was 13 years old when he was granted permanent residency with his family in the United States. He came on a petition that his uncle made for his father. So he, his father, and his mother came to the United States. They remained in the U.S. from February of 2001 until September of 2001. And they, his father obtained a job in the United States even though he was retired when he came from Iran. And they decided that they need to sell their belongings, bring money so they can live here. So they returned to Iran in early September of 2001. Unfortunately, the events of September 2011 occurred as soon as they got to Iran. So they were not allowed to come back. And in November of 2001, his father suffered a heart condition which continued for almost, throughout six years. And Mr. Khoshfahm was not able to come back. He, as soon as he did not have a passport in his own name, he was included in his mother's passport. According to the Iranian law, he was to receive his military, either serve his compulsory military service or receive an exemption, which he could not do that before the age of 18. As soon as he turned 18 in September of 2007, he obtained his military exemption. He obtained his passport in his own name. And within five months, he was in the United States. And unfortunately, he was placed in proceedings. And the immigration judge imputed his parents' alleged abandonment, intent to abandon on him. And as I understand it, his parents have never returned. Yes, they have, Your Honor. They did. They were admitted as LPRs. When? After the hearings. Unfortunately, it's not in the record. It's not in the record? No. Are they here now? His father passed away last year of heart attack, but his mother is here, yes. So what we're really talking about here then, aren't we, is whether the agency can infer such intent to him. Correct. And frankly, this is a heart-rendering situation. And a heart-rendering situation for me. However, I guess you need to tell me how I can get around matter of Zamora and matter of Huang in those situations because I think they're entitled to Chevron deference. Yes, Your Honor. Can you tell me why they aren't and how I can get around them? Well, he is very different from the matter of Zamora. I'm not talking about whether he's different. I'm talking about the concept that they said there. It seemed to me that in matter of Zamora they said that the voluntary and intended abandonment of LPR status by the parent of an unemancipated child is imputed to the child who is deemed to have abandoned his status. That was the holding. Yes, but they had to receive evidence, clear, unequivocal, and convincing evidence that the parents, in fact, had intended to abandon their residence. Well, if we're just going on that, well then, at this record, all I've got to do is find substantial evidence that the parents have abandoned, and I'm afraid there is substantial evidence of that. In fact, I'm not so clear that once he was emancipated there's clear evidence that he ever did it. I mean, if we had it like last case, they would have said, parents, we're going to throw you out. We're going to look at only the conduct of the minor after becoming emancipated, and even then we're not going to do it. In this case, they didn't. They went right back to matter of Zamora, and if I owe matter of Zamora Chevron deference, then I'm kind of stuck. But, Your Honor, even in his decision, and it's on page 1, and I will tell you in a minute, on page 159, I believe, the immigration judge, I'm sorry, I apologize. I just had it in my hand right here. He said that it is not clear cut in my mind that the parents have, in fact, abandoned their residence. And I will tell you the exact page. 177. 175, it says, in the case, in this case, the intent of the parents is not clear cut in my mind. This is the immigration judge's quote in his decision. And so if it was not clear in his mind, how could he impute that on a person who ---- Well, that's exactly what he did. But, Your Honor, that is where the error is. Well, I guess my worry is that he said what he said, and I read the language, and I read what he said. Then I read what the BIA said about it, and I'm still, I guess I'm stuck with Zamora. But even in Zamora, our position is that there must be some form of implicit or explicit abandonment from the parents coming to the children and to the unemancipated minors. And it didn't. In Zamora, there was notice. In Wincken, the person entered with a tourist visa, with a visitor visa. In Karimi Janaki, the mother actually came to the airport, told the immigration official that she only intended to stay there for one year. But in this case, there was absolutely nothing. Throughout his entire testimony, which he was found credible, he testified that he, his parents always intended to come. He intended to come himself. And there was never ---- that they didn't intend to come at all unless he was granted asylum. That is not the, that is not how, unfortunately, that's how it was presented in the government. But it's not. Well, it's not. It's to see what happens in my case. I'm trying to read what the evidence is in the record. And then I'm trying to say, can an IJ who has these people in front of them and is able to hear what they say and see them, can he get some, can he get any way that he can get an intendment like that out of that, what he said? And frankly, I don't know how to argue against what the IJ thought about that. But even in his decision, he stated that the difference with this and Zamora is that the intent, there is no express statement of abandonment. And also the substantial evidence, all they did is they went through family ties, which his father did have a bank account. His father was retired. He didn't even have to work in the U.S., but he just had to go get money. And he was ill. And they presented evidence that he was ill. And that was what the judge asked him. And it was on page 157. It says, can your father fly? And he goes, I think. It wasn't even for sure. There was no substantial evidence in here that the judge had to, that the judge had to, that the judge considered. And not only that, and I wanted to go into the asylum also, Your Honor, if I may. You've got a minute and 48. I will do it very fast, very, very fast. He, the immigration judge determined that because he was detained and he was only suffered an injury on his shoulder that he only could not move it for three months, it was not, it did not raise to the level of persecution. And I would like to ask the Court to look at this Court's decision in Fisher v. INS, where it was determined that a violation of the moral code of the country of Iran is on account of religion. And if somebody is even detained, which the lady in that case was detained and just taken home, that that is considered persecution. And on that basis, we believe that the immigration judge also erred in denying his asylum, application for asylum and withholding of removal because he did suffer persecution. Okay. Thank you, ma'am. Thank you, Your Honor. Ms. Fredrickson, looks like it's your turn. Good morning again. Amy Fredrickson for the government. So there are two different issues that are before the Court in this case. The first is about the abandonment of his LPR status, and then the second is about asylum. With regard to the abandonment issue, the petitioner in this case resided in the United States for only seven months prior to his six-year absence. And at the time of the proceedings, you know, based on the record, his parents never returned to the United States. Counsel, apparently, subsequently, they did. Can he now reapply? What's the status for him now? I think that the proper action would be to file a motion to reopen with the Board and ask the Board to examine the new evidence in the case. But based on this record and the information that we have, based on that information, the substantial evidence supports the Board's conclusion that his parents abandoned their lawful permanent residency, and that abandonment was properly imputed to a petitioner who was a minor during the relevant period. Go ahead. What is the evidence of the parents' abandonment? All right. So the petitioner – first of all, the petitioner testified to two reasons to returning to – his family returning to Iran. The first was to sell land and houses, and the second was because his parents missed his sister. At the time – My question to you is first, what is the evidence of the parents' abandonment? Okay. Yes, Your Honor, I'm getting to that. So the Board conducted – and the immigration judge conducted an inquiry looking at the evidence of record indicating the parents' intent, which included their ties to the United States versus their ties in Iran. Now, although the petitioner testified that his parents went back to Iran for the purpose of selling their property so that they could return to the United States, six years later at the time of the hearing, his parents still had not sold any of that property and were still residing in Iran. That was one of the important things. The other thing that the – the other thing that the Board noted was that his parents had a dual intent based on the petitioner's testimony for returning, and that one of those reasons was because they missed their other family members, and family – specifically his sister, who he testified when they returned was pregnant. And family ties are another important consideration, the family ties in the United States versus the family ties in Iran. The petitioner has uncles who reside here, and it was his – his uncle petitioned for them to be able to come to the United States, but he also has siblings who – he has two sisters who remain in Iran with his parents. Additionally, the – the record shows that they did not have substantial ties in the United States, that he had only a temporary – that his father had only a temporary job. They resided in the United States for only seven months and then proceeded to be absent for over six years. And they – he – he offered kind of confused testimony that – about a bank account, but he wasn't sure whether the bank account in the United States remained open. There was no evidence that there – that they had paid taxes in the United States and they never owned or rented property here and said they resided with their uncle. And all of that information supports the – the board's conclusion that his parents did not intend to remain permanently in the United States and that they did, in fact, abandon their – their LPR status when they returned to Iran. Because his parents abandoned that status and because the petitioner was a minor, their abandonment was properly imputed to the minor. The – the board's decision in matter of Wang says that the – and in matter of Zamora finds that the – because children are incapable of making decisions about where they can reside long term, such as residency and domicile, that the – the parents' intent regarding those issues is properly imputed to the minor. This court has favorably cited the board's decisions in matter of Mercado Zazera. The – this court favorably examined those decisions, finding that the – again, that because the minor is legally incapable of making those decisions about long-term residency, that the parents' intent regarding residency is imputed to the minor. So the board – the substantial evidence supports the board's conclusion that the petitioner, in this case, that his parents abandoned their residency and then properly imputed that abandonment to the petitioner. You might turn then to the asylum. All right. Because that is certainly also a matter of concern. Yes. In this case, the record does not compel the conclusion that petitioner suffered past persecution or has a well-founded fear of future persecution. The incidents that the petitioner described, the board properly concluded, did not amount to past persecution. The petitioner described four different incidents with the police. In each of these incidents, he was never detained for more than a few hours. He was physically injured in only one incident. And the incidents were all for different reasons. Two of the incidents were based on dress code violations. One was for playing happy music during a time of mourning, and one was being – for being with a young lady. In each of these incidents – I said when my counsel, I didn't hear. I'm sorry. In the other incident, he testified that he was having a conversation with a young woman and was stopped by the police for that. In each of these incidents, he was never charged with any crime. He was released after a short detention. There were no allegations that the events ever escalated or that he was threatened outside of these incidents. His family continues to live in Iran, where his two sisters practice as attorneys, and they have not suffered any harms. The – now, the petitioner's counsel pointed to the fact that moral – the moral police in Iran can – that can be an on-account-of question, but that wasn't the question on which the agency decided this case. The question that the agency addressed in deciding the case was whether the incidents that the petitioner suffered were sufficiently severe to amount to persecution, and the record does not compel the conclusion that he – that those incidents were so severe that they amounted to past persecution. What about the article that he wrote? The board – the board properly determined – The board looked into that. Yes, and that goes to the question of whether he has a well-founded fear of future persecution. Correct. That claim is based on conjecture regarding what could happen if the government became aware of the article, but there's not any evidence suggesting that the authorities know that the article exists. He testified – he – well, he offered kind of confused testimony actually regarding his sexuality, but he's not put forth any claim that he's actually a homosexual and would be harmed on that account. Instead, his claim is that the authorities could find out what the article stated if they found out that he supported homosexuals and homosexuality, that he would be harmed on account of that opinion. But it's speculative whether the authorities would find out about that article, particularly in light of the petitioner's own testimony that the – that the principal at his school took the article and hid it from the authorities, and to our knowledge, at this point, the authorities don't – haven't found out that that article exists. In the record, is there a report of country conditions? Is that part of the record? Yes, country conditions are part of the record, and they indicate that there's a lot of problems in Iran, and that – and it does indicate that homosexuals experience problems in Iran, but again, the petitioner hasn't offered testimony indicating that he is a homosexual, and he hasn't argued that he would be harmed on that ground. Instead, his argument is about what would happen if the authorities came to find out that he'd written this article in high school. And that claim is speculative, and the Board properly rejected a well-founded fear of future persecution on that ground. Does the Court have any other questions? I guess the bottom line about this is what my colleague Judge Fletcher's already asked you. It seems a little uneasy to me that we have these people who have LPR status who have no problem whatsoever in their lives, and now we're going around based on what their parents may or may not have done, saying they can't come. And what interest the government had to have in such an idea? I mean, well, again, I mean, unfortunately for these petitioners, LPR status is something that's limited to a certain number of people, and they have rights and responsibilities in maintaining that status, including actually being residents of the United States. And because they did not follow up and do what they needed to do, mainly become actual residents of the United States, the government seeks to revoke that privilege. All right. Thank you. Thank you. You have some more time, ma'am, if you would like. Thank you. Thank you. Your Honor, as to the decision of persecution on account of the asylum, in that matter of Fisher, the court said abundant evidence already exists that repeat violators of moral code are looked upon with suspicion in the regime. And it actually goes on to say that if Fisher in that case can demonstrate persecution on account of religion, it can show that moral codes are likely to be forced against her because of the authorities' intent to punish her. Every time Mr. Khushfa was detained or arrested was for some kind of he was told, as the record shows, that he was told that it was something he did that was against Islam, that it was against a religion. And every single time. The problem comes in that even if to get to your particular argument, we really have to say that somebody was persecuted. You're talking about on account of, and you're making your argument about account of. But I guess we have to get to the persecuted. I mean, my worry is that in these particular matters, persecuted is a tough job for you to make. Because I've got cases where somebody's beaten and robbed of pocket money, but that's not enough. They're accosted by a threatening mob when they were going to Bible school, but that's not enough. They're stripped naked by a student in middle school and beaten, but that's not enough. But, Your Honor, those were not done by the government authorities. Those were done by other groups. They had to be done by the government in order to even get to the point where we would look at it. In other words, either done by the government or by someone the government would not control. Correct. But this is directly from the government, with the code set by the government, that a person talking to a young woman would be, a 17-year-old talking to a girl would be arrested and beaten to the point that she can't move her, his shoulder for three months only because he talked to a girl. That's a... One of the problems I have is there's no evidence of targeting him. All of these incidents seem to be random. And if your theory is correct, every person in Iran has a case for asylum. If at random somebody talks with a woman and gets busted, or one of these other offenses, these are all misdemeanor kind of offenses in our view, and there's no evidence of targeting him and following him around and grabbing him every time they get a chance. It seems to be random. I understand, Your Honor, but also from his testimony, he testified that he is against these codes and he is against these moral values, and that's why he would overtly do it. And for that reason he was arrested. It's not that they... That may be his state of mind. I'm just saying there isn't any evidence that he was actually picked out and targeted for persecution. And if I may, Your Honor, just address the parents' lack of ties. They were only here... Kind of over. I'm so sorry. One sentence only. I'll give you 30 seconds. Thank you. The parents, the father was retired, and they only lived here for seven months, but during those seven months he still worked. And the reason they couldn't afford to... They couldn't bring money. They couldn't own a house. They had to live with his brothers. So family ties, looking to him to show family ties, I believe that would be rather unfair because they didn't have enough time to sell their properties. Thank you very much, Your Honor. Thank you, Your Honor. Case 10-71066, Koshbaum v. Holder, is submitted.
judges: Brewster, Fletcher B. , Smith N. R.